UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| KENT SCHUMANN, OWEN RYAN, TIM BANAS, and SCOTT LEWANDOWSKI, individually and on behalf of all others similarly situated, | Case No. _____ |
| Plaintiffs. | **JURY TRIAL DEMANDED** |
| v. | |
| FCA US LLC, a Delaware Limited Liability Company, | |
| Defendant. | |

**CLASS ACTION COMPLAINT**

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................ 1

II.   JURISDICTION ................................................................. 7

III.  VENUE ............................................................................. 8

IV.   PARTIES .......................................................................... 8

    A.   Plaintiffs ................................................................. 8

        1.   Kent Schumann (California) ................................. 8

        2.   Owen Ryan (Illinois) ............................................ 9

        3.   Tim Banas (Iowa) ............................................... 11

        4.   Scott Lewandowski (Nevada) ............................. 12

    B.   Defendant ............................................................. 13

V.    FACTUAL ALLEGATIONS ........................................... 15

    A.   FCA marketed the Pacifica Hybrid as an extremely safe plug-in electric hybrid that can run in electric mode or on gasoline and knew that these attributes were material to consumers. .............................................................. 15

    B.   The Hybrid Propulsion Defect ............................. 20

    C.   The Hybrid Propulsion Defect is likely the result of defective batteries. ............................................... 22

    D.   The Hybrid Propulsion Defect causes sudden fires and explosions in the Affected Vehicles. ............. 24

    E.   The latest recall is the third time that Pacifica Hybrids have been recalled for fire risks. ............. 30

    F.   There is an agency relationship between FCA and FCA dealerships. ....................................................... 31

VI.     TOLLING OF THE STATUTE OF LIMITATIONS ................................. 35

     A.      Discovery Rule Tolling .................................................................... 35

     B.      Fraudulent Concealment Tolling ...................................................... 36

     C.      Estoppel ............................................................................................ 36

VII.    CLASS ALLEGATIONS ............................................................................ 37

VIII.   CLAIMS ...................................................................................................... 41

     A.      Nationwide Claim ............................................................................. 41

COUNT I  VIOLATION OF THE MAGNUSON-MOSS WARRANTY
     ACT  15 U.S.C. § 2301, *et. seq.* ................................................... 41

     B.      State-Specific Claims ....................................................................... 46

COUNT II  VIOLATION OF SONG-BEVERLY CONSUMER
     WARRANTY ACT  FOR BREACH OF IMPLIED
     WARRANTY OF MERCHANTABILITY UNDER
     CALIFORNIA LAW (CAL. CIV. CODE §§ 1791.1 & 1792) ................... 46

COUNT III  UNJUST ENRICHMENT UNDER CALIFORNIA LAW ............. 49

COUNT IV  BREACH OF IMPLIED WARRANTY OF
     MERCHANTABILITY UNDER ILLINOIS LAW  (810 ILCS
     5/2-314) ................................................................................................ 50

COUNT V  UNJUST ENRICHMENT UNDER ILLINOIS LAW ...................... 51

COUNT VI  BREACH OF IMPLIED WARRANTY OF
     MERCHANTABILITY UNDER IOWA LAW (Iowa Code.
     § 554.2314) ......................................................................................... 52

COUNT VII  UNJUST ENRICHMENT UNDER IOWA LAW ......................... 55

COUNT VIII  BREACH OF IMPLIED WARRANTY OF
     MERCHANTABILITY UNDER NEVADA LAW (Nev. REV.
     STAT. § 104.2314) ............................................................................... 56

COUNT IX  UNJUST ENRICHMENT UNDER NEVADA LAW .................... 58

REQUEST FOR RELIEF ........................................................................ 59

DEMAND FOR JURY TRIAL ............................................................... 60

010611-12 973802 V1

Plaintiffs file this lawsuit individually and on behalf of proposed Nationwide and state-wide classes. Plaintiffs allege the following based on personal knowledge as to their own acts and experiences and, as to all other matters, based on the investigation of counsel:

## I.     INTRODUCTION

1.     The most important duty of a car manufacturer is to provide consumers with a safe car. A second related duty is to warn consumers and fix or replace a car where the manufacturer learns of a vehicle defect that implicates serious safety issues.

2.     FCA US LLC ("FCA") breached these fundamental duties by selling Chrysler Pacifica Hybrid minivans that were dangerously defective and prone to catching fire and exploding. Then, long after FCA knew or should have known of the fire risk, it did nothing to either warn owners and lessees or provide a remedy for the defect.

3.     Model year 2017 and 2018 Chrysler Pacifica Hybrid minivans (the "Affected Vehicles")[1] contain a defect in the hybrid propulsion system that can

---

[1] So far, FCA has recalled only model years 2017 and 2018 of the Pacifica Hybrid. Plaintiffs' counsel continues to investigate whether other model years contain the same defect and should, therefore, be recalled. Plaintiffs may update the definition of Affected Vehicles to include subsequent model years.

- 1 -

cause vehicle fires and explosions, even when the vehicles are parked with the ignition in the "off" position (the "Hybrid Propulsion Defect").

4.      The Hybrid Propulsion Defect exposes putative class members to an unreasonable risk of accident, injury, death, or property damage in the event that their vehicle catches fire while in operation or, perhaps more commonly, spontaneously ignites while the vehicle is parked at the class member's home, on a public street, or in a public parking lot. The Hybrid Propulsion Defect also exposes passengers, other drivers on the road, neighbors, owners of other cars parked near the Affected Vehicles, and other bystanders to an unreasonable risk of accident, injury, death, and/or property damage.

5.      The results of the Hybrid Propulsion defect are horrific, as the following photos illustrate:[2]

---

[2] **Exhibit 1**, photos of Pacifica fire posted by user Bsmith to Pacifica Forums, https://www.pacificaforums.com/threads/a-second-pacifica-phev-fire.43545/ (June 15, 2019).



Source: https://www.pacificaforums.com/threads/a-second-pacifica-phev-fire.43545/#lg=thread-43545&slide=0



Source: https://www.pacificaforums.com/threads/a-second-pacifica-phev-fire.43545/#lg=thread-43545&slide=1

010611-12 973802 V1



Source: https://www.pacificaforums.com/threads/a-second-pacifica-phev-fire.43545/#lg=thread-43545&slide=2

6.      The catastrophic fire risk is the direct result of a defect long known to, concealed by, and still unremedied by FCA. Not only did FCA conceal the defect from consumers, but it also concealed its consequences, including the serious safety hazards and monetary harm caused by the Hybrid Propulsion Defect—e.g., damage to a home and injury or death to persons inhabiting that home should the Affected Vehicle spontaneously ignite while the vehicle is parked in an attached garage.

7.      The Affected Vehicles are plug-in hybrid electric vehicles, and some (but not all) of the known fire incidents have occurred while the vehicles are charging. Alarmingly to consumers, while FCA contends that the root cause of the fires is unknown, it appears overwhelmingly likely that the defect is connected to

the vehicles' high-voltage batteries used to propel the vehicles when they are operating in electric mode.

8.     The high-voltage batteries in the Affected Vehicles were made by LG Chem (now LG Energy Solution, or "LGES"). LGES also made the allegedly defective batteries that caused fires in GM Bolt electric vehicles and Hyundai electric vehicles. In connection with the Bolt recalls, LGES agreed to pay GM $1.9 billion dollars.

9.     Though FCA now admits to having received reports of a dozen fires connected with the hybrid propulsion system since 2019, it waited until February 2022 before issuing a recall of the Affected Vehicles. However, FCA is not offering owners and lessees of the Affected Vehicles any remedy.

10.     Instead, FCA "is advising owners of these hybrid vehicles to refrain from charging them, and to park them away from structures and other vehicles." Certainly a car that cannot be parked at its home is not fit for its ordinary purpose. FCA does not explain what owners should do with their vehicles if they have no such place to park their vehicles. This places an unfair burden on class members who are unable to use the electric propulsion system they paid a $6,000 premium for and are unable to park in their garage (and may have to park quite far away from their homes in order to park away from other vehicles).

11.     Moreover, not being able to plug in and charge the Affected Vehicles defeats the central purpose of having a plug-in hybrid vehicle. Absent charging, the Affected Vehicles must run exclusively on their gasoline engine, causing owners of Affected Vehicles to constantly purchase gasoline. Again, this defect renders a plug-in hybrid electric vehicle unfit for its ordinary purpose.

12.     FCA knew or should have known about the Hybrid Propulsion Defect for some time, as evidenced by: (1) consumer complaints launched with the National Highway Traffic Safety Administration ("NHTSA") and elsewhere online; (2) its own investigation of fires in the Affected Vehicles; and (3) the similar fire issues in other electric vehicles with LGES batteries.

13.     Stunningly, many of the Affected Vehicles have already been recalled twice to remedy other defects that also created a risk of fire. The first such recall came in 2018 and the second in 2020.

14.     FCA offers no actual remedy for the Hybrid Propulsion Defect and offers no reimbursement to Affected Vehicle owners and lessees for out-of-pocket expenses, loss of use, and loss of value. Because no repair is available, vehicle owners and lessees are left without a safely operable vehicle for an unknown and potentially lengthy period.

15.     Because of FCA's breaches of implied warranties and its failure to act more quickly in disclosing and providing a remedy for the Hybrid Propulsion

010611-12 973802 V1

Defect, owners and lessees of Affected Vehicles are injured in fact, incurred damages, and suffered ascertainable losses in money and property. Had Plaintiffs and the putative class members known of the Hybrid Propulsion Defect, then they would either not have purchased or leased those vehicles, or would have paid substantially less for them, or would have purchased non-hybrid versions of the vehicles, which cost at least $6,000 less. Fires in the Affected Vehicles also necessitate expensive repairs, car rentals, car payments, towing charges, property damage, time off work, loss of use and other miscellaneous costs.

16. Plaintiffs bring this class action to redress FCA's misconduct. Plaintiffs seek damages and a repair under the Magnuson-Moss Warranty Act, 15 U.S.C. §§ 23-1-2312, and state laws of implied warranty and unjust enrichment.

## II. JURISDICTION

17. This Court has original jurisdiction over this lawsuit under the Class Action Fairness Act of 2005, 28 U.S.C. §§ 1332(d)(2) and (6), because Plaintiffs and Defendant are citizens of different states; there are more than 100 members of the Classes (as defined herein); the aggregate amount in controversy exceeds $5 million, exclusive of attorneys' fees, interest, and costs; and class members reside across the United States. The citizenship of each party is described further below in the "Parties" section.

010611-12 973802 V1

18.     This Court has personal jurisdiction over the Defendant by virtue of its transactions and business conducted in this judicial district, and because Defendant is headquartered in Michigan. Defendant has transacted and done business, and violated statutory and common law, in the State of Michigan and in this judicial district.

## III.   VENUE

19.     Venue is proper in this judicial district under 28 U.S.C. § 1391 because Defendant transacts substantial business and is headquartered in this district.

## IV.   PARTIES

**A.     Plaintiffs**

**1.     Kent Schumann (California)**

20.     Plaintiff and proposed class representative Kent Schumann ("Plaintiff," for purposes of this paragraph) is a resident and citizen of Bonsall, California. Plaintiff first purchased a 2018 Chrysler Pacifica Hybrid in the fall of 2017 from Tuttle-Click Chrysler Dodge Jeep Ram in Irvine, California. When the car stopped functioning in mid-2018, however, the dealership acknowledged that the car was a lemon, and replaced it in about late November of 2018 with a new 2018 Chrysler Pacifica Hybrid. Plaintiff's Pacifica Hybrid is an Affected Vehicle equipped with the Hybrid Propulsion Defect. Through exposure and interaction with Chrysler, Plaintiff was aware of Chrysler's uniform and pervasive marketing

messages of dependability and safety and the benefits of being able to drive the vehicle in electric mode; these were primary reasons Plaintiff purchased the Affected Vehicle. However, despite touting the safety and dependability of the Affected Vehicles and the benefits of using the vehicle in its electric mode, at no point did Chrysler or its agents, dealers, or other representatives disclose to Plaintiff the Hybrid Propulsion Defect. Plaintiff regularly services the vehicle but is now concerned about driving it due to the dangers resulting from the Hybrid Propulsion Defect. In addition, it is impossible for Plaintiff to park the Affected Vehicle away from structures and other vehicles as Chrysler has instructed because there are no such spaces near Plaintiff's home or work. Moreover, because Plaintiff can no longer charge the plug-in hybrid vehicle, Plaintiff must pay for gas to use the vehicle that Plaintiff would not have needed were the hybrid propulsion system able to operate as intended. Plaintiff would not have purchased the vehicle, or would have paid less for it, or Plaintiff would have purchased a non-hybrid version of the Pacifica, had Plaintiff known about the Hybrid Propulsion Defect.

**2.  Owen Ryan (Illinois)**

21.  Plaintiff and proposed class representative Owen Ryan ("Plaintiff," for purposes of this paragraph) is a resident and citizen of Plano, Texas. Plaintiff purchased a used 2018 Chrysler Pacifica Hybrid on March 15, 2019, from Heller Motors, a Chrysler Dodge Jeep and Ram dealership in Pontiac, Illinois. Plaintiff's

Pacifica Hybrid is an Affected Vehicle equipped with the Hybrid Propulsion Defect. Through exposure and interaction with Chrysler, Plaintiff was aware of Chrysler's uniform and pervasive marketing messages of dependability and safety and the benefits of being able to drive the vehicle in electric mode; these were primary reasons Plaintiff purchased the Affected Vehicle. However, despite touting the safety and dependability of the Affected Vehicles and the benefits of using the vehicle in its electric mode, at no point did Chrysler or its agents, dealers, or other representatives disclose to Plaintiff the Hybrid Propulsion Defect. Plaintiff regularly services the vehicle but is now concerned about driving it due to the dangers resulting from the Hybrid Propulsion Defect. In addition, it is impossible for Plaintiff to park the Affected Vehicle away from structures and other vehicles as Chrysler has instructed because there are no such spaces near Plaintiff's home. Moreover, because Plaintiff can no longer charge the plug-in hybrid vehicle, Plaintiff must pay for gas to use the vehicle that Plaintiff would not have needed were the hybrid propulsion system able to operate as intended. Plaintiff would not have purchased the vehicle, or would have paid less for it, or Plaintiff would have purchased a non-hybrid version of the Pacifica, had Plaintiff known about the Hybrid Propulsion Defect.

- 10 -

### 3.     Tim Banas (Iowa)

22.     Plaintiff and proposed class representative Tim Banas ("Plaintiff," for purposes of this paragraph) is a resident and citizen of Bolingbrook, Illinois. Plaintiff purchased a 2018 Chrysler Pacifica Hybrid on December 3, 2019, from Turpin Chrysler Dodge Jeep in Dubuque, Iowa. Plaintiff's Pacifica Hybrid is an Affected Vehicle equipped with the Hybrid Propulsion Defect. Through exposure and interaction with Chrysler, Plaintiff was aware of Chrysler's uniform and pervasive marketing messages of the benefits of being able to drive the vehicle in electric mode; that was the primary reason Plaintiff purchased the Affected Vehicle. Plaintiff also believed the vehicle was safe. However, despite touting the safety and dependability of the Affected Vehicles and the benefits of using the vehicle in its electric mode, at no point did Chrysler or its agents, dealers, or other representatives disclose to Plaintiff the Hybrid Propulsion Defect. Plaintiff regularly services the vehicle but is now concerned about driving it due to the dangers resulting from the Hybrid Propulsion Defect. In addition, it is impossible for Plaintiff to park the Affected Vehicle away from structures and other vehicles as Chrysler has instructed because there are no such spaces near Plaintiff's work. Moreover, because Plaintiff can no longer charge the plug-in hybrid vehicle, Plaintiff must pay for gas to use the vehicle that Plaintiff would not have needed were the hybrid propulsion system able to operate as intended. Plaintiff would not

have purchased the vehicle, or would have paid less for it, or Plaintiff would have purchased a non-hybrid version of the Pacifica, had Plaintiff known about the Hybrid Propulsion Defect.

### 4.    Scott Lewandowski (Nevada)

23.    Plaintiff and proposed class representative Scott Lewandowski ("Plaintiff," for purposes of this paragraph) is a resident and citizen of Pahrump, Nevada. Plaintiff purchased a 2018 Chrysler Pacifica Hybrid on April 3, 2018, from Chapman Chrysler Jeep in Henderson, Nevada. Plaintiff's Pacifica Hybrid is an Affected Vehicle equipped with the Hybrid Propulsion Defect. Through exposure and interaction with Chrysler, Plaintiff was aware of Chrysler's uniform and pervasive marketing messages of dependability and safety and the benefits of being able to drive the vehicle in electric mode; these were primary reasons Plaintiff purchased the Affected Vehicle. However, despite touting the safety and dependability of the Affected Vehicles and the benefits of using the vehicle in its electric mode, at no point did Chrysler or its agents, dealers, or other representatives disclose to Plaintiff the Hybrid Propulsion Defect. Plaintiff regularly services the vehicle but is now concerned about driving it due to the dangers resulting from the Hybrid Propulsion Defect. In addition, it is impossible for Plaintiff to park the Affected Vehicle away from structures and other vehicles as Chrysler has instructed because there are no such spaces near Plaintiff's home or

- 12 -

work. Plaintiff is also concerned about having to park his vehicle outside (as opposed to in his garage) because of the detrimental impacts of inclement weather (including dust storms, extreme sunlight and temperatures that can exceed 110 degrees). Plaintiff is also concerned about the threat that his vehicle will be vandalized. Moreover, because Plaintiff can no longer charge the plug-in hybrid vehicle, Plaintiff must pay for gas to use the vehicle that Plaintiff would not have needed were the hybrid propulsion system able to operate as intended. Plaintiff would not have purchased the vehicle, or would have paid less for it, or Plaintiff would have purchased a non-hybrid version of the Pacifica, had Plaintiff known about the Hybrid Propulsion Defect.

**B.      Defendant**

24.     Defendant FCA US LLC ("FCA"), formerly known as Chrysler Group, is a Delaware limited liability company organized and existing under the laws of the State of Delaware, and is wholly owned by Stellantis N.V., a Dutch corporation headquartered in Amsterdam, Netherlands. FCA's principal place of business and headquarters is at 1000 Chrysler Dr., Auburn Hills, MI 48326.

25.     FCA is a motor vehicle manufacturer and a licensed distributor of new, previously untitled Chrysler, Dodge, Jeep, and Ram brand motor vehicles. FCA's Chrysler brand is one of the "Big Three" American automobile brands.

FCA engages in commerce by distributing and selling new and used passenger cars and motor vehicles under its Chrysler, Dodge, Jeep, and Ram brands.

26.     FCA, through its various entities, designs, manufactures, markets, distributes, and sells automobiles throughout the U.S. and worldwide. FCA and/or its agents designed and manufactured the Affected Vehicles. FCA also developed and disseminated the owner's manuals and warranty booklets, advertisements, brochures, and other promotional materials relating to the Affected Vehicles, with the intent that such documents be purposely distributed throughout all fifty states. FCA is engaged in interstate commerce, selling vehicles through its network in every state of the United States.

27.     As further detailed below, FCA-authorized automobile dealerships act as FCA's agents in selling automobiles under the FCA name and disseminating vehicle information provided by FCA to customers. At all relevant times, FCA's dealerships served as its agents for motor vehicle repairs and warranty issues because they performed repairs, replacements, and adjustments covered by FCA's manufacturer warranty pursuant to the contracts between FCA and its more than 2,000 authorized dealerships nationwide.

## V.    FACTUAL ALLEGATIONS

**A.    FCA marketed the Pacifica Hybrid as an extremely safe plug-in electric hybrid that can run in electric mode or on gasoline and knew that these attributes were material to consumers.**

28.    Plug-in hybrid-electric vehicles like the Affected Vehicles have significant environmental advantages over conventional vehicles with internal combustion engines. While operating in electric mode, the Affected Vehicles do not produce any of the noxious tailpipe emissions—such as nitrogen oxides and other smog-forming pollutants, other pollutants harmful to human health, and greenhouse gases such as carbon dioxide and methane—that vehicles with internal combustion engines produce.[3] When functioning properly, then, the Affected Vehicles can be beneficial for air quality and public health, and can help to reduce the overall ecological damage caused by using personal vehicles for transportation.[4] This benefit is especially significant in states where most electricity is generated from sources other than coal-fired plants.[5]

29.    In addition to the environmental benefits of electric propulsion, the cost of the electricity necessary to enable the operation of the Affected Vehicles in

---

[3] **Exhibit 2**, *Emissions from Hybrid and Plug-In Electric Vehicles*, U.S. DEP'T OF ENERGY, https://afdc.energy.gov/vehicles/electric_emissions.html (last visited March 24, 2022).

[4] *Id.*

[5] *Id.* (state-by-state calculator showing that charging an all-electric vehicle in Oregon produces less than 17% of the carbon dioxide equivalent of that produced by gasoline- powered vehicles).

- 15 -

electric mode vehicle is generally considerably less than the cost of fueling with gasoline or diesel.[6]

30.     Consumers paid a substantial premium for the plug-in hybrid propulsion system in the Affected Vehicles. In 2018, the base sticker price for the Pacifica Hybrid was $6,000 more than the price for a standard Pacifica.[7]

31.     The only reason to pay the premium price commanded by the Affected Vehicles was because of the perceived environmental and financial benefits they offered.

32.     Not surprisingly, then, in marketing the Affected Vehicles, FCA stressed that the Pacifica Hybrid was "America's first-ever Hybrid minivan" and that it averaged 84 miles per gallon.

---

[6] **Exhibit 3**, Brooke Crothers, *Rising Gas Prices Driving You To An Electric Car? Cost To Charge A Tesla Model 3 Vs Gas*, FORBES (May 22, 2021) https://www.forbes.com/sites/brookecrothers/2021/05/22/rising-gas-prices-driving-you-to-an-electric-car-cost-to-charge-a-tesla-model-3-vs-gas/?sh=47c68b4a7192 (last visited March 24, 2022); **Exhibit 4**, Roberto Baldwin, *EV vs. Gas: Which Cars Are Cheaper to Own?*, CAR AND DRIVER (May 22, 2020), https://www.caranddriver.com/shopping-advice/a32494027/ev-vs-gas-cheaper-to-own/ (last visited March 24, 2022).

[7] *See* **Exhibit 10**, Eric Bangeman, ARS TECHNICA (Apr. 2, 2018), https://arstechnica.com/cars/2018/04/review-go-greener-with-chryslers-plug-in-pacifica-hybrid-minivan/#:~:text=The%20Pacifica%20Hybrid%20starts%20at,a%20base%20price%20of%20%2444%2C995 (last visited April 8, 2022).

010611-12 973802 V1

33.   Indeed, a major selling point of the Affected Vehicles is their ability to run on electric power.

34.   According to a sales brochure for the 2018 Pacifica Hybrid, the vehicle reflected "A mission for reducing emissions":



35.   Elsewhere in the same brochure, FCA continues to tout the electric driving ability of the Affected Vehicles:



36.     Another 2018 brochure for the gas-powered and hybrid Pacifica stated that:



37.     In addition to the alleged environmentally-friendly nature of the Pacifica Hybrid, FCA also stressed the alleged extreme safety of the vehicles as FCA knew this was a material attribute for consumers. In a 2018 brochure for the

Affected Vehicles, FCA stated, "Your family's safety and security are what matter most":



Your family's safety and security are what matter most

38.      Indeed, that same brochure is replete with pictures of children in the Affected Vehicles and describes an extensive set of safety features.

39.      Another brochure for the 2018 Pacifica states that "[y]our travels will inspire while ensuring the well-being of all your beings with over 100 standard and available safety and security features":



Long and winding roads reveal panoramic views within the purposefully planned, kid-friendly road-trip vehicle. Your travels will inspire while ensuring the well-being of all your beings with over 100 standard and available safety and security features. The available seating for eight offers plenty of elbow room, as well as your turn to relax, needing only to focus on the road ahead. The ergonomic advantages of Pacifica make it easy to count on a peaceful trip.



## B.    The Hybrid Propulsion Defect

40.    As FCA now admits in a February 14, 2022 notification of a safety recall sent to the National Highway Traffic Safety Administration ("NHTSA"), a defect in the Hybrid Propulsion System can cause the Affected Vehicles to spontaneously burst into flames.

41.    FCA further admits that "[a] vehicle fire can occur when parked, even with the vehicle in the off position."

42.    Plainly, FCA failed to adequately research, design, test, and manufacture the Affected Vehicles before warranting, advertising, promoting, marketing, and selling the Affected Vehicles as suitable and safe for use in an intended and reasonably foreseeable manner.

43.    Although FCA claims that the "root cause" of the Hybrid Propulsion Defect is unknown, the nature of the fires and the fact they can occur even while the vehicle is not running, strongly suggests that the defect is connected to the

010611-12 973802 V1

high-voltage lithium battery that powers the electric propulsion of the Affected Vehicles.

44.     The high-voltage batteries in the Affected Vehicles are 16-kWh lithium-ion batteries made by LG Chem (now LG Energy Solution, or "LGES").

45.     LGES also made the batteries that allegedly caused fires in GM's Bolt EV and Bolt EUV cars built from 2017 to 2022. As a result, LGES agreed to pay GM $1.9 billion for the costs of a recall of those GM cars.

46.     In addition, LGES made the batteries used in 2017 to 2020 Hyundai vehicles that were recalled in February 2021 to address a battery defect that posed a fire risk.

47.     LGES issued the following statement in response to FCA's recall of the Affected Vehicles:

> There is no confirmed root cause of fires in the STLA vehicles that is subject to the recall, or proof directly linking to the battery, as mentioned in its statement. Considering STLA's statement, LGES has no further comment.

48.     So far, FCA has only recalled the 2017 and 2018 Pacifica Hybrids. However, FCA has continuously sold Pacifica Hybrids to this day, and continues to use LGES 16-kWh lithium-ion batteries.

49.     Accordingly, Plaintiffs' counsel continues to investigate whether additional model years of the Pacifica Hybrid are also plagued with the Hybrid Propulsion Defect.

## C.  The Hybrid Propulsion Defect is likely the result of defective batteries.

50.  Like the Affected Vehicles, most electric and hybrid electric vehicles use Lithium Ion batteries because of their "high power-to-weight rations, high energy efficiency, good high-temperature performance, and low self-discharge."[8]

51.  However, lithium ion batteries also carry well-documented risks of spontaneous ignition.[9] Safety concerns related to unexpected fires have been well documented all over the world, and were known to FCA at the time it designed, manufactured, and sold the Affected Vehicles.

52.  Significantly, the documented fires in the Affected Vehicles do not appear to be the result of external abuse. Indeed, most have resulted from an internal failure while the cars are parked. Reports suggest that this type of spontaneous ignition caused by so-called "thermal runaway" has caused as many as 80% of lithium-ion battery fires.[55]

---

[8] **Exhibit 5**, *Batteries for Hybrid and Plug-In Electric Vehicles*, U.S. DEP'T OF ENERGY, https://afdc.energy.gov/vehicles/electric_batteries.html (last visited March 24, 2022).

[9] *See* **Exhibit 6**, Adreesh Ghoshal, *How Lithium Ion Batteries in EVs Catch Fire*, MEDIUM (Aug. 16, 2020), https://medium.com/the-innovation/how-lithium-ion-batteries-in-evs-catch-fire-9d166c5b3af1 (last visited March 24, 2022); *see also* **Exhibit 7**, Ryan Fogelman, *April 2020 Fire Report: How & Why Do Lithium-Ion Batteries Fail, Insight from the Jedi Master of Lithium Power!*, WASTE360 (May 5, 2020), https://www.waste360.com/safety/april-2020-fire-report-how-why-do-lithium-ion-batteries-fail-insight-jedi-master-lithium (last visited March 24, 2022).

53.     That fact, together with the use of LGES batteries in the Affected

Vehicles, make it overwhelmingly likely that the Hybrid Propulsion Defect is in

fact the result of defectively designed, manufactured, or installed batteries.

54.     Like other batteries, lithium-ion batteries are made up, in pertinent

part, of multiple power-generating compartments called "cells."[10] Each cell

contains the basic functional components of a battery: a positive electrode, a

negative electrode, and an electrolyte.[11] In addition, each cell contains a separator

designed to keep the positive electrode from coming in contact with the negative

electrode.[12]

55.     Electrodes store the lithium. The electrolyte carries the lithium ions

between electrodes.[13]

56.     When lithium ions flow from the negative electrode, or anode, to the

positive electrode, or cathode, energy is discharged from the battery cell in the

---

[10] **Exhibit 8**, Chris Woodford, *Lithium-ion batteries*, EXPLAINTHATSTUFF!
(Nov. 23, 2020), https://www.explainthatstuff.com/how-lithium-ion-batteries-work.html (last visited March 24, 2022).

[11] *Id.*

[12] **Exhibit 9**, Heekyon Yang, *Explainer: Are lithium-ion batteries in EVs a fire hazard?*, Reuters (Aug. 23, 2021), https://www.reuters.com/business/autos-transportation/are-lithium-ion-batteries-evs-fire-hazard-2021-08-23/#:~:text=Lithium%2Dion%20batteries%2C%20whether%20they,battery%20is%20not%20designed%20correctly (last visited March 24, 2022).

[13] *Id.*

form of electricity.[14] When the cell is charging, those ions flow in the opposite direction, or from cathode to anode.

57.     Proper design, manufacture, and rigorous pre-sale testing is particularly important for lithium batteries and the related software used in electric vehicles and plug-in hybrid electric such as the Affected Vehicles.

58.     Extreme care must be taken when using lithium-ion batteries to electrically propel cars. That is primarily because the batteries use organic liquid electrolytes, which are volatile and flammable when operating at high temperatures.[15]

59.     According to GM, the fires that led to the Bolt recall were caused by manufacturing defects in the LGES batteries. The defects may be a torn anode tab and folded separator present in the same battery cell, which increases the risk of fire.[16]

**D.     The Hybrid Propulsion Defect causes sudden fires and explosions in the Affected Vehicles.**

60.     On information and belief, FCA knew or should have known about the Hybrid Propulsion Defect long before it disclosed the problem, as evidenced by: (1) consumer complaints lodged with NHTSA and elsewhere online;

---

[14] *Id.*

[15] *Id.*

[16] *Id.*

010611-12 973802 V1

(2) consumer complaints lodged with FCA directly; and (3) other similar fire issues in GM Bolts and Hyundai vehicles that (like the Affected Vehicles) use LGES batteries for electric propulsion.

61.     No later than fall 2018, Pacifica owners and lessees began complaining that their Affected Vehicles suddenly caught fire.

62.     All vehicle manufacturers, including FCA, are required by law to routinely monitor and analyze NHTSA complaints to determine whether vehicles or components should be recalled due to safety concerns. Thus, FCA has knowledge of all NHTSA complaints filed concerning the vehicles it manufacturers, including the Affected Vehicles. *See* TREAD Act, Pub. L. No. 106-414, 114 Stat. 1800 (2000).

63.     Complaints submitted to FCA and to NHTSA via Vehicle Owner Questionnaires ("VOQ") reveal multiple instances of Affected Vehicles catching on fire.

64.     As one Affected Vehicle owner stated in a complaint to NHTSA in 2018, only "[t]wo weeks" after purchasing a new Pacifica, "the engine started smoking and caught fire while I was driving my family" on a Washington highway.

65. Other owners reported similar experiences to NHTSA, reproduced, verbatim, in the following paragraphs.

010611-12 973802 V1

66.     September 20, 2018 NHTSA ID NUMBER: 11130465
        Components: ELECTRICAL SYSTEM, ENGINE
        NHTSA ID Number: 11130465
        Incident Date September 15, 2018
        Consumer Location WOODBRIDGE, VA
        Vehicle Identification Number 2C4RC1L72JR****
        Summary of Complaint: TL* THE CONTACT OWNS A 2018
        CHRYSLER PACIFICA HYBRID. WHILE THE CONTACT'S
        WIFE WAS DRIVING 70 MPH, AN ABNORMAL NOISE WAS
        HEARD AND THE ENGINE STALLED. THE CONTACT
        NOTICED SMOKE COMING FROM UNDER THE HOOD. WHEN
        THE VEHICLE WAS STOPPED AND THE HOOD WAS LIFTED,
        THE CONTACT NOTICED FLAMES COMING FROM THE REAR
        OF THE ENGINE IN FRONT OF THE FIREWALL. THE FIRE
        MARSHALL EXTINGUISHED THE FIRE AND THE POLICE
        FILED REPORT NUMBER: 2018-2716. THE CAUSE OF THE
        FIRE WAS UNKNOWN. THERE WERE NO INJURIES. THE
        VEHICLE WAS TOWED TO AN UNKNOWN CHRYSLER
        DEALER, BUT HAD NOT BEEN DIAGNOSED. IT WAS
        UNKNOWN IF THE VEHICLE WAS DESTROYED. THE
        MANUFACTURER WAS NOT NOTIFIED OF THE FAILURE.
        THE FAILURE MILEAGE WAS APPROXIMATELY 2,900.
        CONSUMER STATED VEHICLE STATUS IS IN LIMBO.
        CHRYSLER STATED "WE ARE UNABLE TO DISCUSS THE
        CASE DUE TO AN OPEN ONGOING INVESTIGATION." AS OF
        THIS NEXT SATURDAY, 6 OCTOBER, IT WILL BE 3 WEEKS
        THAT THE VEHICLE WILL BE SITTING ON THE DEALERSHIP
        LOT. UPDATED 10/18/18*JB ...*BF *BF. UPDATED 10/31/18*JB
        1 Affected Product: CHRYSLER      PACIFICA HYBRID     2018

67.     September 24, 2018 NHTSA ID NUMBER: 11130931
        Components: UNKNOWN OR OTHER
        NHTSA ID Number: 11130931
        Incident Date September 23, 2018
        Consumer Location HIRAM, GA
        Vehicle Identification Number 2C4RC1N75JR****
        Summary of Complaint: WE PURCHASED A NEW 2018
        CHRYSLER PACIFICA HYBRID ON SEPTEMBER 3RD.
        YESTERDAY, SEPTEMBER 23RD, WE LEFT TO GO ON A
        VACATION. LESS THAN 30 MINUTES INTO OUR TRIP (WITH

- 26 -

3 MILES REMAINING ELECTRIC RANGE) WE HEARD A
CLUNK AND THE ENGINE LIGHT CAME ON. AS THE
ELECTRIC RANGE WENT OUT WE LOST ALL PROPULSION,
AND MY HUSBAND WAS ABLE TO STEER IT ONTO AN EXIT
RAMP AS BLACK SMOKE BEGAN BILLOWING FROM
BENEATH THE HOOD. WE AND OUR TWO CHILDREN AND
MY UNCLE ALL EXITED THE VEHICLE. THE HOOD WAS
POPPED AND A HERO UNIT ARRIVED, THE ENGINE
COMPARTMENT WAS IN FLAMES. WE WERE ASKED TO GET
AWAY FROM THE VEHICLE AND THE FIRE WAS
EXTINGUISHED AS ANOTHER FIRE TRUCK ARRIVED.
KNOWING THE AMOUNT OF LITHIUM ION BATTERIES ON
BOARD, A FIRE, ESPECIALLY ONE THAT STARTED
INEXPLICABLY, WAS TERRIFYING. WE HAVE NOT HAD A
RESPONSE FROM OUR CHRYSLER DEALER, AT THIS TIME.
... *BF...*BF. UPDATED 10/29/18*JB UPDATED 10/31/18*JB
1 Affected Product: CHRYSLER     PACIFICA HYBRID     2018

68.     June 15, 2019 NHTSA ID NUMBER: 11220341
        Components: ELECTRICAL SYSTEM, ENGINE,
        FUEL/PROPULSION SYSTEM
        NHTSA ID Number: 11220341
        Incident Date June 15, 2019
        Consumer Location FORT WORTH, TX
        Vehicle Identification Number 2C4RC1N74JR****
        Summary of Complaint: PHEV VAN WAS CHARGING
        OVERNIGHT WHILE PLUGGED INTO HOUSE OUTLET (110V)
        USING MANUFACTURER SUPPLIED CHARGING CABLE. AT
        AROUND 7 AM WE HEARD AN EXPLOSION AND FOUND THE
        VAN BURNING IN OUR DRIVEWAY. VEHICLE WAS
        QUICKLY ENGULFED IN FLAMES. FIRE TRUCK PUT IT OUT
        AFTER ARRIVING (~5-6 MINUTES, I THINK). NO ONE WAS
        INJURED, IN OR NEAR THE CAR WHEN IT HAPPENED. A
        NEST CAMERA ACROSS THE STREET SHOWED THAT THE
        VEHICLE WAS SMOKING PRIOR TO THE EXPLOSION. *BF*JB
        *DT *DT*DT INFORMATION REDACTED PURSUANT TO THE
        FREEDOM OF INFORMATION ACT (FOIA), 5 U.S.C.
        552(B)(6).*JB *TR
        1 Affected Product: CHRYSLER     PACIFICA HYBRID     2018

69.     January 14, 2020 NHTSA ID NUMBER: 11299263
        Components: ELECTRICAL SYSTEM
        NHTSA ID Number: 11299263
        Incident Date September 20, 2019
        Consumer Location KALAMAZOO, MI
        Vehicle Identification Number 2C4RC1N73JR****
        Summary of Complaint: AS OF 1/14/20 CHRYSLER AND KEVIN
        PIKE FROM NEDERVELD ARE STILL INVESTIGATING. ON
        9/20 AROUND 5AM WE WERE AWOKE TO AN EXPLOSION
        SOUND. IT WAS OUR GARAGE DOOR BEING BLOWN TO THE
        STREET AND THE INTERIOR GARAGE DOOR BEING BLOWN
        INWARDS. THIS WAS DUE TO A FIRE THAT STARTED IN
        OUR GARAGE CONFIRMED TO HAVE STARTED WHERE THE
        PACIFICA WAS PARKED. THE PACIFICA HAD BEEN
        PLUGGED IN TO A JUICEBOX CHARGER PROFESSIONALLY
        WIRED WITH A DEDICATED 220V OUTLET SINCE AROUND
        7PM THE PREVIOUS EVENING. I BELIEVE SOMETHING
        MALFUNCTIONED WITH THE CAR'S ELECTRIC BATTERY
        CAUSING IT TO START A FIRE THAT BUILT UP IN THE
        GARAGE AND EVENTUALLY CAUSED A TOTAL LOSS OF
        OUR HOME AND EVERYTHING INSIDE IT. WE DID NOT
        HAVE ANY OTHER FLAMMABLE OR EXPLOSIVE
        SUBSTANCES IN THE GARAGE BESIDES A 1 GALLON GAS
        CONTAINER ON THE OTHER SIDE OF THE GARAGE
        CONFIRMED TO NOT BE NEAR THE START OF THE FIRE.
        THE VEHICLE HAD BEEN COMPLETELY DRAINED OF
        BATTERY THE PREVIOUS DAY, PLUGGED IN AND WAS
        CHARGING OVERNIGHT. THIS DESCRIPTION ALSO
        MATCHES THE SAME DESCRIPTION 2 OTHER FAMILIES
        HAVE POSTED ONLINE OF THEIR PACIFICA CATCHING FIRE
        BUT THEIR VEHICLES WERE PARKED OUTSIDE SO DID NOT
        BURN DOWN THEIR HOMES AND NO INVESTIGATION WAS
        CONDUCTED.*DT*JB*DT *DT*JB*DT*JB*DT THE
        CONSUMER PROVIDED PHOTOS. *TR
        1 Affected Product: CHRYSLER        PACIFICA HYBRID      2018

- 28 -

70.     Despite FCA's knowledge of the serious risk of explosion and fire in the Affected Vehicles, it did nothing to remedy the problem or even warn consumers until very recently.

71.     According to a Part 573 Recall Report that FCA sent to NHTSA on February 11, 2022, FCA's Technical Safety and Regulatory Compliance organization began investigating "a potential trend in fires" in certain Pacifica Hybrids on August 31, 2021.

72.     Between September 2021 and January 2022, FCA bought back two of these vehicles "for origin and cause investigation," but as of yet "[t]he cause of these fires is under investigation."

73.     In the Part 573, FCA admitted that it was "aware of ten additional fires," and "[t]he cause of these fires is under investigation," for a total of twelve such fires. According to FCA, it received the twelve field reports concerning these fires "from April 23, 2019, to December 14, 2021."

74.     Finally, on February 6, 2022, FCA's Vehicle Regulations Committee decided "to conduct a voluntary safety recall of the affected vehicles."

75.     However, in large part due to its slowness to even acknowledge the issue, FCA is not yet offering any remedy for the defect. Instead, FCA advises the hapless Affected Vehicle owners and lessees "to refrain from charging them, and to park them away from structures and other vehicles." FCA does not explain what

owners should do with their vehicles if they have no such place to park their vehicles, and is not offering to buy back the vehicles or even provide loaner vehicles until such time as it can fix the problem.

**E.    The latest recall is the third time that Pacifica Hybrids have been recalled for fire risks.**

76.    FCA previously recalled over 10,000 2017 and 2018 Pacifica Plug-In Hybrid minivans in 2018 for a fire issue related to the vehicle's fuel system. According to the recall notice (Recall No. 18V740000), "After the vehicle has been operating in PHEV propulsion mode, the gas-fueled engine may not restart properly resulting in unburned fuel entering the exhaust catalyst."

77.    In other words, the engine might not restart properly after running in EV mode, and the fuel being fed to the engine could make its way past the exhaust manifold to the catalytic converters and ignite. The recall remedy was to update the computer, visually inspect the catalytic converters and replace them if needed.

78.    Then, in 2020, FCA issued another recall for some 23,079 Pacifica Plug-In Hybrid minivans due to a fire risk resulting from a corroded electrical connection involving the Pacifica's 12-volt battery system (Recall No. 20V334000). That battery is used to power auxiliary features such as radios and garage door openers, and is not part of the vehicle's plug-in hybrid propulsion system.

79.     When the 2020 recall issued, FCA advised Pacifica hybrid owners to park their vehicles outdoors and away from other vehicles until they were repaired.

**F.     There is an agency relationship between FCA and FCA dealerships.**

80.     Upon information and belief, the manufacturer FCA has impliedly or expressly acknowledged that FCA-authorized dealerships are its sales agents, the dealers have accepted that undertaking, FCA has the ability to control authorized FCA dealers, and FCA acts as the principal in that relationship, as is shown by the following:

     i.     FCA can terminate the relationship with its dealers at will;

     ii.     The relationships are indefinite;

     iii.     FCA is in the business of selling vehicles as are its dealers;

     iv.     FCA provides tools and resources to help FCA dealers sell vehicles;

     v.     FCA supervises its dealers regularly;

     vi.     Without FCA, the relevant FCA dealers would not exist;

     vii.     FCA requires the following of its dealers:

          1.     Reporting of sales;

          2.     Computer network connection with FCA;

          3.     Training of dealers' sales and technical personnel;

          4.     Use of FCA-supplied computer software;

5.      Participation in FCA's training programs;

6.      Establishment and maintenance of service departments in FCA dealerships;

7.      Certification of FCA pre-owned vehicles;

8.      Reporting to FCA with respect to the car delivery, including reporting Plaintiffs' names, addresses, preferred titles, primary and business phone numbers, e-mail addresses, vehicle VIN numbers, delivery date, type of sale, lease/finance terms, factory incentive coding, if applicable, vehicles' odometer readings, extended service contract sale designations, if any, and names of delivering dealership employees; and

9.      Displaying FCA logos on signs, literature, products, and brochures within FCA dealerships.

viii.   Dealerships bind FCA with respect to:

1.      Warranty repairs on the vehicles the dealers sell; and

2.      Issuing service contracts administered by FCA.

ix.   FCA further exercises control over its dealers with respect to:

1.      Financial incentives given to FCA dealer employees;

- 32 -

2.   Locations of dealers;

3.   Testing and certification of dealership personnel to ensure

compliance with FCA's policies and procedures; and

4.   Customer satisfaction surveys, pursuant to which FCA

allocates the number of FCA cars to each dealer, thereby

directly controlling dealership profits.

x.   FCA dealers sell FCA vehicles on FCA's behalf, pursuant to a

"floor plan," and FCA does not receive payment for its cars

until the dealerships sell them.

xi.   Dealerships bear FCA's brand names, use FCA's logos in

advertising and on warranty repair orders, post FCA-branded

signs for the public to see, and enjoy a franchise to sell FCA's

products, including the Affected Vehicles.

xii.   FCA requires FCA dealers to follow the rules and policies of

FCA in conducting all aspects of dealer business, including

the delivery of FCA's warranties described above, and the

servicing of defective vehicles such as the Affected Vehicles.

xiii.   FCA requires its dealers to post FCA's brand names, logos, and

signs at dealer locations, including dealer service departments,

and to identify themselves and to the public as authorized FCA

- 33 -

dealers and servicing outlets for FCA cars.

xiv.  FCA requires its dealers to use service and repair forms containing FCA's brand names and logos.

xv.  FCA requires FCA dealers to perform FCA's warranty diagnoses and repairs, and to do the diagnoses and repairs according to the procedures and policies set forth in writing by FCA.

xvi.  FCA requires FCA dealers to use parts and tools either provided by FCA, or approved by FCA, and to inform FCA when dealers discover that unauthorized parts have been installed on one of FCA's vehicles.

xvii.  FCA requires dealers' service and repair employees to be trained by FCA in the methods of repair of FCA-brand vehicles.

xviii.  FCA audits FCA dealerships' sales and service departments and directly contacts the customers of said dealers to determine their level of satisfaction with the sale and repair services provided by the dealers; dealers are then granted financial incentives or reprimanded depending on the level of satisfaction.

xix.  FCA requires its dealers to provide FCA with monthly statements and records pertaining, in part, to dealers' sales and

servicing of FCA vehicles.

xx.  FCA provides technical service bulletins and messages to its
dealers detailing chronic defects present in product lines, and
repair procedures to be followed for chronic defects.

xxi.  FCA provides its dealers with specially trained service and
repair consultants with whom dealers are required by FCA to
consult when dealers are unable to correct a vehicle defect on
their own.

xxii.  FCA requires FCA vehicle owners to go to authorized FCA
dealers to obtain servicing under FCA warranties.

xxiii.  FCA dealers are required to notify FCA whenever a car is sold or
put into warranty service.

## VI.  TOLLING OF THE STATUTE OF LIMITATIONS

### A.  Discovery Rule Tolling

81.  Because FCA concealed the existence of the Hybrid Propulsion
Defect, Class members had no way of knowing about the unreasonable fire risk of
the Affected Vehicles.

82.  Within the period of any applicable statutes of limitation, Plaintiffs
and members of the proposed Classes could not have discovered through the

- 35 -

exercise of reasonable diligence that FCA was concealing the conduct complained of herein.

83.     Plaintiffs and the other Class members did not discover, and did not know of, facts that would have caused a reasonable person to suspect that FCA did not report information within its knowledge to federal and state authorities, its dealerships, or consumers; nor would a reasonable and diligent investigation have disclosed that FCA had concealed information about the unreasonable fire risk of the Affected Vehicles, which was discovered by Plaintiffs only shortly before this action was filed.

84.     For these reasons, all applicable statutes of limitation have been tolled by operation of the discovery rule with respect to claims as to the Affected Vehicles.

**B.     Fraudulent Concealment Tolling**

85.     All applicable statutes of limitation have also been tolled by FCA's knowing and active fraudulent concealment and denial of the facts alleged herein throughout the period relevant to this action.

**C.     Estoppel**

86.     FCA was under a continuous duty to disclose to Plaintiffs and the other Class members the true character, quality, and nature of the fire risk of the Affected Vehicles.

87.     FCA knowingly, affirmatively, and actively concealed or recklessly

disregarded the true nature, quality, and character of the fire risk of the Affected

Vehicles.

88.     Based on the foregoing, FCA is estopped from relying on any statutes

of limitations in defense of this action.

## VII.   CLASS ALLEGATIONS

89.     Plaintiffs bring this action on behalf of themselves and as a class

action, pursuant to the provisions of Rules 23(a) and (b)(3) of the Federal Rules of

Civil Procedure, on behalf of the following classes:

> **Nationwide Class**: All persons or entities who purchased
> or leased one or more model year 2017-2018 Chrysler
> Pacifica Hybrid minivans (the "Affected Vehicles").
>
> **California Class**: All persons or entities who purchased or
> leased one or more of the Affected Vehicles in the State of
> California.
>
> **Illinois Class**: All persons or entities who purchased or leased
> one or more of the Affected Vehicles in the State of Illinois.
>
> **Iowa Class**: All persons or entities who purchased or leased
> one or more of the Affected Vehicles in the State of Iowa.
>
> **Nevada Class:** All persons or entities who purchased or leased
> one or more of the Affected Vehicles in the State of Nevada.

90.     Plaintiffs assert claims under the laws of each state set forth below.

91.     Excluded from each Class are individuals who have personal injury

claims resulting from the fires or explosions caused by the Affected Vehicles. Also

excluded from the Class are FCA and its subsidiaries and affiliates; all persons who make a timely election to be excluded from the Class; governmental entities; the Judge to whom this case is assigned and his/her immediate family; and Plaintiffs' Counsel. Plaintiffs reserve the right to revise the Class definition based upon information learned through discovery.

92.     Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

93.     This action has been brought and may be properly maintained on behalf of the Classes proposed herein under Federal Rule of Civil Procedure 23.

94.     **Numerosity**. Federal Rule of Civil Procedure 23(a)(1): The members of each Class are so numerous and geographically dispersed that individual joinder of all Class members is impracticable. For purposes of this complaint, Plaintiffs allege that there are estimated to be 16,700 or more Affected Vehicles in the Nationwide Class. The precise number of Class members is unknown to Plaintiffs but may be ascertained from FCA's books and records. Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, Internet postings, and/or published notice.

95. **Commonality and Predominance**: Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3): This action involves common questions of law and fact, which predominate over any questions affecting individual Class members, including, without limitation:

a)     Whether FCA engaged in the conduct alleged herein;

b)     Whether the Hybrid Propulsion Defect creates an unreasonable risk of fires in the Affected Vehicles;

c)     When FCA first knew about the Hybrid Propulsion Defect;

d)     Whether FCA designed, manufactured, marketed, and distributed the Affected Vehicles with defective high-voltage batteries;

e)     Whether FCA's conduct renders it liable for breach of the implied warranty of merchantability;

f)     Whether FCA has been unjustly enriched at the expense of Plaintiffs and the Classes;

g)     Whether Plaintiffs and the other Class members overpaid for their vehicles at the point of sale; and

h)     Whether Plaintiffs and the other Class members are entitled to damages and other monetary relief and, if so, in what amount.

96. **Typicality**: Federal Rule of Civil Procedure 23(a)(3): Plaintiffs' claims are typical of the other Class members' claims because, among other things,

all Class members were comparably injured through FCA's wrongful conduct as described above.

97. **Adequacy**: Federal Rule of Civil Procedure 23(a)(4): Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of the other members of the Classes they seek to represent; Plaintiffs have retained counsel competent and experienced in complex class action litigation; and Plaintiffs intend to prosecute this action vigorously. The Classes' interests will be fairly and adequately protected by Plaintiffs and their counsel.

98. **Superiority**: Federal Rule of Civil Procedure 23(b)(3): A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiffs and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against FCA, so it would be impracticable for the members of the Classes to individually seek redress for FCA's wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the

benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## VIII.  CLAIMS

**A.      Nationwide Claim**

### COUNT I

### VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT
### 15 U.S.C. § 2301, *ET. SEQ.*

99.      Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set forth herein.

100.   Plaintiffs bring this Count on behalf of a Nationwide Class (collectively for purposes of this Count, the "Magnuson-Moss Class").

101.   This Court has jurisdiction to decide claims brought under 15 U.S.C. § 2301 by virtue of 28 U.S.C. § 1332(a)-(d).

102.   The Affected Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3). The Plaintiffs and Magnuson-Moss Class members are consumers because they are persons entitled under applicable state law to enforce against the warrantor the obligations of its implied warranties.

103.   FCA is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

104.   15 U.S.C. § 2301(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with an implied warranty.

105.   FCA provided Plaintiffs and Magnuson-Moss Class members with an implied warranty of merchantability in connection with the purchase or lease of their vehicles that is an "implied warranty" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(7). As a part of the implied warranty of merchantability, FCA warranted that the Affected Vehicles engines were fit for their ordinary purpose as safe motor vehicles and would pass without objection in the trade as designed, manufactured, and marketed, and were adequately contained, packaged, and labeled.

98.   FCA breached its implied warranties, as described in more detail above, and is therefore liable to Plaintiffs pursuant to 15 U.S.C. § 2310(d)(1). Without limitation, the Affected Vehicles share a common defect in that they are all equipped with a Hybrid Propulsion System that makes the vehicles susceptible to a risk of spontaneous ignition, causing an unreasonable risk of death, serious bodily harm and/or property damage to lessees and owners of the Affected Vehicles as well as their homes, passengers and bystanders. This defect rendered the Affected Vehicles when sold/leased and at all times thereafter, unmerchantable and unfit for their ordinary use of hybrid driving. In fact, as a result of the defect, FCA specifically advise owners and lessees not to charge their batteries and not

- 42 -

to drive the Affected Vehicles in electric mode.

106. In its capacity as warrantor and a result of its monitoring obligations under the TREAD Act as discussed above, FCA had knowledge of the inherently defective nature of the Hybrid Propulsion System in the Affected Vehicles long before Class members knew of the defect. Any effort by FCA to limit the implied warranties in a manner that would exclude coverage of the Affected Vehicles is unconscionable, and any such effort to disclaim or otherwise limit such liability is null and void.

107. Any limitations FCA might seek to impose on its warranties are procedurally unconscionable. There was unequal bargaining power between FCA and Plaintiffs, as, at the time of purchase and lease, Plaintiffs had no other options for purchasing warranty coverage other than directly from FCA.

108. Any limitations FCA might seek to impose on its warranties are substantively unconscionable. FCA knew that the Affected Vehicles were defective that the Affected Vehicles could spontaneously ignite when used as intended long before Plaintiffs and the Class. FCA failed to disclose this defect to Plaintiffs and the Class. Thus, enforcement of the durational limitations on the warranties is harsh and shocks the conscience.

109. Plaintiffs have had sufficient direct dealings with either FCA or its agents (dealerships) to establish privity of contract between FCA and Plaintiffs.

Nonetheless, privity is not required here because Plaintiffs are intended third-party beneficiaries of contracts between FCA and its dealers, and specifically, of FCA's implied warranties. The dealers were not intended to be the ultimate consumers of the Affected Vehicles and have no rights under the warranty agreements provided with the Affected Vehicles; the warranty agreements were designed for and intended to benefit consumers. Finally, privity is also not required because the Affected Vehicles are dangerous instrumentalities due to the aforementioned defect, as spontaneous fires present an unreasonable risk of death, serious bodily harm and/or property damage to lessees and owners of the Affected Vehicles as well as their homes, passengers and bystanders.

110. Pursuant to 15 U.S.C. § 2310(e), Plaintiffs are entitled to bring this class action and are not required to give FCA notice and an opportunity to cure until such time as the Court determines the representative capacity of Plaintiffs pursuant to Rule 23 of the Federal Rules of Civil Procedure.

111. Plaintiffs would suffer economic hardship if they returned their Affected Vehicles but did not receive the return of all payments made by them. Because FCA will not acknowledge any revocation of acceptance and immediately return any payments made, Plaintiffs have not re-accepted their Affected Vehicles by retaining them.

112.   The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum of $25. The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit. Plaintiffs, individually and on behalf of all other Magnuson-Moss Class members, seek all damages permitted by law, including diminution in value of their vehicles, in an amount to be proven at trial. In addition, pursuant to 15 U.S.C. § 2310(d)(2), Plaintiffs are entitled to recover a sum equal to the aggregate amount of costs and expenses (including attorneys' fees based on actual time expended) determined by the Court to have reasonably been incurred by Plaintiffs and the other Magnuson-Moss Class members in connection with the commencement and prosecution of this action.

113.   Plaintiffs also seek the establishment of an FCA-funded program for Plaintiffs and Magnuson-Moss Class members to recover out-of-pocket costs incurred in attempting to rectify and/or mitigate the effects of the Hybrid Propulsion System Defect in their Affected Vehicles.

**B.      State-Specific Claims**

## COUNT II

**VIOLATION OF SONG-BEVERLY CONSUMER WARRANTY ACT
FOR BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
UNDER CALIFORNIA LAW
(CAL. CIV. CODE §§ 1791.1 & 1792)**

**(Alleged by Plaintiff Schumann on Behalf of the California Class)**

114.    Plaintiff and the California Class reallege and incorporate by reference all paragraphs as though fully set forth herein.

115.    Plaintiff brings this action on behalf of themselves and the California Class.

116.    Plaintiff and the California Class members are "buyers" within the meaning of CAL. CIV. CODE § 1791(b).

117.    The Affected Vehicles are "consumer goods" within the meaning of CIV. CODE § 1791(a).

118.    FCA is the "manufacturer" of the Affected Vehicles within the meaning of CAL. CIV. CODE § 1791(j).

119.    FCA impliedly warranted to Plaintiff and the California Class that the Affected Vehicles were "merchantable" within the meaning of CAL. CIV. CODE §§ 1791.1(a) & 1792; however, the Affected Vehicles do not have the quality that a buyer would reasonably expect, and were therefore not merchantable.

120.    CAL. CIV. CODE § 1791.1(a) states:

"Implied warranty of merchantability" or "implied warranty that goods are merchantable" means that the consumer goods meet each of the following:

(1)    Pass without objection in the trade under the contract description.

(2)    Are fit for the ordinary purposes for which such goods are used.

(3)    Are adequately contained, packaged, and labeled.

(4)    Conform to the promises or affirmations of fact made on the container or label.

121.    The Affected Vehicles were not merchantable when sold or leased because their Hybrid Propulsion Systems are prone to spontaneous ignition, and pose an unreasonable risk of fires due to the Hybrid Propulsion Defect as described herein. Without limitation, the Affected Vehicles share a common defect in that they are all equipped with a Hybrid Propulsion System that makes the vehicles susceptible to a risk of spontaneous ignition, causing an unreasonable risk of death, serious bodily harm and/or property damage to lessees and owners of the Affected Vehicles as well as their homes, passengers and bystanders. This defect renders the Affected Vehicles when sold/leased and at all times thereafter, unmerchantable and unfit for their ordinary use of driving. In fact, as a result of the defect, FCA specifically advises owners and lessees not to charge their batteries and not to drive the Affected Vehicles in electric mode.

122.    FCA breached the implied warranty of merchantability by selling Affected Vehicles containing defects leading to the sudden incineration of the

- 47 -

vehicles during ordinary operating conditions, or while parked. This defect has deprived Plaintiff and the California Class members of the benefit of their bargain.

123.   Notice of breach is not required because Plaintiff and the California members Class did not purchase their automobiles directly from FCA.

124.   Plaintiff and the other California Class members were and are third-party beneficiaries to FCA's contracts with FCA-certified/authorized retailers who sold or leased the Affected Vehicles to Plaintiff and California Class members.

125.   As a direct and proximate result FCA's breach of the implied warranty of merchantability, Plaintiff and the California Class members received goods whose dangerous condition now renders them at least partially inoperable and substantially impairs their value. Plaintiff and the California Class members have been damaged as they overpaid for their vehicles, and now suffer the partial or complete loss of use of their Affected Vehicles.

126.   Under CAL. CIV. CODE §§ 1791.1(d) & 1794, Plaintiff and the California Class members are entitled to damages and other legal and equitable relief including, at their election, the purchase price of their Affected Vehicles, or the overpayment or diminution in value of their Affected Vehicles.

127.   Under CAL. CIV. CODE § 1794, Plaintiff and the California Class members are entitled to costs and attorneys' fees.

## COUNT III

### UNJUST ENRICHMENT UNDER CALIFORNIA LAW

### (Alleged by Plaintiff Schumann on Behalf of the California Class)

128. Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

129. Plaintiff brings this claim on behalf of themselves and the California Class.

130. This claim is pleaded in the alternative to the contract-based claims brought on behalf of Plaintiff and the California Class.

131. FCA has received and retained a benefit from Plaintiff and California Class members and inequity has resulted.

132. FCA has benefitted from selling, leasing, and distributing the Affected Vehicles for more than they were worth as a result of FCA's conduct, at a profit, and Plaintiff and California Class members have overpaid for the Affected Vehicles and been forced to pay other costs.

133. Thus, Plaintiff and the California Class conferred a benefit on FCA.

134. It is inequitable for FCA to retain these benefits.

135. Plaintiff and the California Class were not aware of the true facts about the Affected Vehicles and did not benefit from FCA's conduct.

136. FCA knowingly accepted the benefits of its unjust conduct.

- 49 -

137.   As a result of FCA's conduct, the amount of its unjust enrichment should be determined in an amount according to proof.

## COUNT IV

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY UNDER ILLINOIS LAW (810 ILCS 5/2-314)

**(Alleged by Plaintiff Ryan on behalf of the Illinois Class)**

138.   Plaintiff and the Illinois Class reallege and incorporate by reference all paragraphs as though fully set forth herein.

139.   Plaintiff brings this action on behalf of himself and the Illinois Class.

140.   FCA is a "merchant" within the meaning of 810 ILCS 5/2-103(2) and 810 ILCS 5/2-104, and a "seller" of motor vehicles within the meaning of 810 ILCS 5/2-103(1)(d).

141.   Under Illinois law, an implied warranty of merchantability attaches to the Affected Vehicles. 810 ILCS 5/2-314.

142.   The Affected Vehicles were not merchantable when sold or leased because their Hybrid Propulsion Systems are prone to spontaneous ignition, and pose an unreasonable risk of fires due to the Hybrid Propulsion Defect as described herein. Without limitation, the Affected Vehicles share a common defect in that they are all equipped with a Hybrid Propulsion System that makes the vehicles susceptible to a risk of spontaneous ignition, causing an unreasonable risk of death,

- 50 -

serious bodily harm and/or property damage to lessees and owners of the Affected

Vehicles as well as their homes, passengers and bystanders. This defect renders the

Affected Vehicles when sold/leased and at all times thereafter, unmerchantable and

unfit for their ordinary use of driving. In fact, as a result of the defect, FCA

specifically advises owners and lessees not to charge their batteries and not to drive

the Affected Vehicles in electric mode.

143.   Plaintiff and the other Illinois Class members were and are third-party

beneficiaries of FCA's contracts with FCA-certified/authorized retailers who sold

or leased the Affected Vehicles to Plaintiff and Illinois Class members.

144.   As a direct and proximate result of FCA's breach of the implied

warranty of merchantability, Plaintiff and the other Illinois Class members have

been damaged in an amount to be determined at trial.

## COUNT V

### UNJUST ENRICHMENT UNDER ILLINOIS LAW

### (Alleged by Plaintiff Ryan on behalf of the Illinois Class)

145.   Plaintiff incorporates by reference all paragraphs as though fully set

forth herein.

146.   Plaintiff brings this claim on behalf of himself and the Illinois Class.

147.   This claim is pleaded in the alternative to the contract-based claims

brought on behalf of Plaintiff and the Illinois Class.

010611-12 973802 V1

148.   FCA has received and retained a benefit from Plaintiff and Illinois Class members and inequity has resulted.

149.   FCA has benefitted from selling, leasing, and distributing the Affected Vehicles for more than they were worth as a result of FCA's conduct, at a profit, and Plaintiff and Illinois Class members have overpaid for the Affected Vehicles and been forced to pay other costs.

150.   Thus, Plaintiff and Illinois Class members conferred a benefit on FCA.

151.   It is inequitable for FCA to retain these benefits.

152.   Plaintiff and Illinois Class members were not aware of the true facts about the Affected Vehicles and did not benefit from FCA's conduct.

153.   FCA knowingly accepted the benefits of its unjust conduct.

154.   As a result of FCA's conduct, the amount of its unjust enrichment should be determined in an amount according to proof.

## COUNT VI

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY UNDER IOWA LAW (IOWA CODE. § 554.2314)

### (Alleged by Plaintiff Banas on Behalf of the Iowa Class)

155.    Plaintiff and the Iowa Class reallege and incorporate by reference all paragraphs as though fully set forth herein.

156.    Plaintiff brings this action on behalf of himself and the Iowa Class.

157.    FCA is a "merchant" of the Affected Vehicles within the meaning of Iowa Code § 554.2104 and a "seller" of the Affected Vehicles within the meaning of Iowa Code § 554.2103(d), and the Affected Vehicles are "goods" under Iowa Code. § 554.2105

158.    Under Iowa law, an implied warranty of merchantability attaches to the Affected Vehicles. Iowa Code § 554.2314.

159.    The Affected Vehicles were not merchantable when sold or leased because their Hybrid Propulsion Systems are prone to spontaneous ignition, and pose an unreasonable risk of fires due to the Hybrid Propulsion Defect as described herein. Without limitation, the Affected Vehicles share a common defect in that they are all equipped with a Hybrid Propulsion System that makes the vehicles susceptible to a risk of spontaneous ignition, causing an unreasonable risk of death, serious bodily harm and/or property damage to lessees and owners of the Affected Vehicles as well as their homes, passengers and bystanders. This defect renders the Affected Vehicles when sold/leased and at all times thereafter, unmerchantable and unfit for their ordinary use of driving. In fact, as a result of the defect, FCA

specifically advises owners and lessees not to charge their batteries and not to drive the Affected Vehicles in electric mode.

160.   Plaintiff and the other Iowa Class members were and are third-party beneficiaries to FCA's contracts with FCA-certified/authorized retailers who sold or leased the Affected Vehicles to Plaintiff and Iowa Class members.

161.   It was reasonable to expect that Plaintiff and the Iowa Class members would use, consume or be affected by the Affected Vehicles, and they are therefore entitled to the protections of the implied warranty of merchantability under Iowa Code § 554.2318.

162.   FCA was provided notice of these issues within a reasonable time of Plaintiff's knowledge of the non-conforming or defective nature of the Affected Vehicles by the filing of this Complaint, by letters from Plaintiff's counsel, on behalf of Plaintiff, to  FCA, consumer complaints to NHTSA regarding the defect that is the subject of this Complaint, and/or by the  allegations contained in this Complaint.

163.   As a direct and proximate result of FCA's breach of the implied warranty of merchantability, Plaintiff and the other Iowa Class members have been damaged in an amount to be determined at trial.

## COUNT VII

## UNJUST ENRICHMENT UNDER IOWA LAW

### (Alleged by Plaintiff Banas on behalf of the Iowa Class)

164.   Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

165.   Plaintiff bring this claim on behalf of himself and the Iowa Class.

166.   This claim is pleaded in the alternative to the contract-based claims brought on behalf of Plaintiff and the Iowa Class.

167.   FCA has received and retained a benefit from Plaintiff and Iowa Class members and inequity has resulted.

168.   FCA has benefitted from selling, leasing, and distributing the Affected Vehicles for more than they were worth as a result of FCA's conduct, at a profit, and Plaintiff and the Iowa Class members have overpaid for the Affected Vehicles and been forced to pay other costs.

169.   Thus, all Plaintiff and the Iowa Class conferred a benefit on FCA.

170.   It is inequitable for FCA to retain these benefits.

171.   Plaintiff and the Iowa Class were not aware of the true facts about the Affected Vehicles and did not benefit from FCA's conduct.

172.   FCA knowingly accepted the benefits of its unjust conduct.

010611-12 973802 V1

173.   As a result of FCA's conduct, the amount of its unjust enrichment should be determined in an amount according to proof.

## COUNT VIII

**BREACH OF IMPLIED WARRANTY OF**
**MERCHANTABILITY UNDER NEVADA LAW**
**(NEV. REV. STAT. § 104.2314)**

**(Alleged by Plaintiff Lewandowski on Behalf of the Nevada Class)**

174.   Plaintiff and the Nevada Class reallege and incorporate by reference all paragraphs as though fully set forth herein.

175.   Plaintiff brings this action on behalf of himself and the Nevada Class.

176.   FCA is a "merchant" of the Affected Vehicles within the meaning of Nev. Rev. Stat. § 104.2104, and the Affected Vehicles are "goods" under Nev. Rev. Stat. § 1-4.2105(1).

177.   Under Nevada law, an implied warranty of merchantability attaches to the Affected Vehicles. Nev. Rev. Stat. § 1-4.2314.

178.   The Affected Vehicles were not merchantable when sold or leased because their Hybrid Propulsion Systems are prone to spontaneous ignition, and pose an unreasonable risk of fires due to the Hybrid Propulsion Defect as described herein. Without limitation, the Affected Vehicles share a common defect in that they are all equipped with a Hybrid Propulsion System that makes the vehicles susceptible to a risk of spontaneous ignition, causing an unreasonable risk of death,

010611-12 973802 V1

serious bodily harm and/or property damage to lessees and owners of the Affected

Vehicles as well as their homes, passengers and bystanders. This defect renders the

Affected Vehicles when sold/leased and at all times thereafter, unmerchantable and

unfit for their ordinary use of driving. In fact, as a result of the defect, FCA

specifically advises owners and lessees not to charge their batteries and not to drive

the Affected Vehicles in electric mode.

179.    Plaintiff and the other Nevada Class members were and are third-party

beneficiaries to FCA's contracts with FCA-certified/authorized retailers who sold

or leased the Affected Vehicles to Plaintiff and Nevada Class members.

180.    It was reasonable to expect that Plaintiff and the Nevada Class

members would use, consume or be affected by the Affected Vehicles, and they are

therefore entitled to the protections of the implied warranty of merchantability

under Nev. Rev. Stat. § 1-4.2318.

181.    FCA was provided notice of these issues within a reasonable time of

Plaintiff's knowledge of the non-conforming or defective nature of the Affected

Vehicles by the filing of this Complaint, by letters from Plaintiff's counsel, on

behalf of Plaintiff, to  FCA, consumer complaints to NHTSA regarding the defect

that is the subject of this Complaint, and/or by the  allegations contained in this

Complaint.

182.    As a direct and proximate result of FCA's breach of the implied warranty of merchantability, Plaintiff and the other Nevada Class members have been damaged in an amount to be determined at trial.

## COUNT IX

### UNJUST ENRICHMENT UNDER NEVADA LAW

**(Alleged by Plaintiff Lewandowski on behalf of the Nevada Class)**

183.    Plaintiff incorporates by reference all paragraphs as though fully set forth herein.

184.    Plaintiff bring this claim on behalf of himself and the Nevada Class.

185.    This claim is pleaded in the alternative to the contract-based claims brought on behalf of Plaintiff and the Nevada Class.

186.    FCA has received and retained a benefit from Plaintiff and Nevada Class members and inequity has resulted.

187.    FCA has benefitted from selling, leasing, and distributing the Affected Vehicles for more than they were worth as a result of FCA's conduct, at a profit, and Plaintiff and the Nevada Class members have overpaid for the Affected Vehicles and been forced to pay other costs.

188.    Thus, all Plaintiff and the Nevada Class conferred a benefit on FCA.

189.    It is inequitable for FCA to retain these benefits.

190.   Plaintiff and the Nevada Class were not aware of the true facts about the Affected Vehicles and did not benefit from FCA's conduct.

191.   FCA knowingly accepted the benefits of its unjust conduct.

192.   As a result of FCA's conduct, the amount of its unjust enrichment should be determined in an amount according to proof.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of members of the Classes, respectfully request that the Court enter judgment in their favor and against FCA, as follows:

A.   Certification of the proposed Nationwide and State Classes, including appointment of Plaintiffs' counsel as Class Counsel;

B.   Restitution, including at the election of Class members, recovery of the purchase price of their Affected Vehicles, or the overpayment for their vehicles;

C.   Damages, including punitive damages, costs, and disgorgement in an amount to be determined at trial;

D.   An order requiring FCA to pay both pre- and post-judgment interest on any amounts awarded;

E.   An award of costs and attorneys' fees; and

F.   Such other or further relief as may be appropriate.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial for all claims so triable.

DATED: April 8, 2022                  Respectfully Submitted,

HAGENS BERMAN SOBOL SHAPIRO LLP

By */s/ Steve W. Berman*
    Steve W. Berman
Thomas E. Loeser
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com
toml@hbsslaw.com

E. Powell Miller (P39487)
Sharon S. Almonrode (P33938)
The Miller Law Firm PC
950 W. University Dr., Ste. 300
Rochester, MI 48307
Telephone: (248) 841-2200
Facsimile: (248) 652-2852
epm@millerlawpc.com
ssa@millerlawpc.com

*Attorneys for Plaintiffs and the Proposed Class*

010611-12 973802 V1